OPINION OF THE COURT
 

 Bellacosa, J.
 

 On this appeal, we must determine whether the use of personal professional expertise by jurors, communicated to the whole jury, constitutes juror misconduct affecting its guilty verdict so as to warrant a new trial. Jurors testified at a postverdict CPL 330.30 hearing that during deliberations they were informed of and influenced by two nurse-jurors’ professional opinions. The trial court found sufficient misconduct warranting a new trial. The Appellate Division reversed and upheld the verdict. A Judge of this Court granted defendant leave to appeal. We now reverse and reinstate the County Court order directing a new trial.
 

 Defendant was charged with manslaughter in the first and second degrees. At trial, medical issues involving the cause of death were vigorously contested. The prosecution submitted medical evidence including expert testimony that the cause of death was blunt force trauma to the victim’s liver and spleen, with massive internal bleeding. The prosecution used this evidence to present to the jury its theory of the case — that defendant repeatedly punched his girlfriend in the abdomen, causing substantial blood loss and death.
 

 Defendant maintained that the victim suffered from seizure-type symptoms and died from a venous air embolism. The defense presented evidence, including expert testimony, to rebut the People’s theory of the case and to support its opposing theories. Defense experts testified that autopsy results were consistent with death from an air embolism or other
 
 *572
 
 cardiac event. One defense expert, Dr. Stahl, concluded that the reported blood volume loss was inadequate to cause loss of consciousness or shock, let alone death. He opined that the decedent’s ventricular fibrillation and congested blood vessels, as noted in the autopsy report, were consistent with an air embolism but inconsistent with death from a loss of blood. Dr. Stahl also testified that, although rare, lacerations of the spleen and liver could occur due to improperly administered CPR performed for an extended period of time. Testimony was adduced that CPR was performed on the deceased for approximately two hours.
 

 The jury returned a verdict of not guilty of the manslaughter charges, but guilty of criminally negligent homicide. Defense counsel later became aware of the possibility of juror misconduct through newspaper articles involving the case. A CPL 330.30 motion to set aside the verdict ensued. Insofar as pertinent to this appeal, defendant asserted that the jury deliberations were compromised and the verdict tainted by injection of juror professional opinions shared with the full jury. These opinions consisted of nonevidentiary assessments regarding the volume of blood loss necessary to cause ventricular defibrillation.
 

 At the CPL 330.30 hearing, two jurors testified that another juror, who was a registered nurse, told the jury that, in her medical experience and estimation, the reported volume of the victim’s blood loss could have caused ventricular fibrillation which would result in death. The nurse-juror also indicated to the deliberating jury that she had seen patients suffer ventricular fibrillation as a result of blood loss. This opinion was first expressed to another juror, also a nurse, at the hotel room they shared during sequestration. The next day, this information was communicated to the entire jury during their deliberations. The second nurse-juror also performed personal estimations of the blood volume loss and shared them with the rest of the jury.
 

 The trial court granted defendant’s motion to set aside the verdict on grounds that a juror became an unsworn witness on the People’s behalf, and the jury thus ventured beyond the legally admitted evidence at trial. The Appellate Division reversed and reinstated the verdict (263 AD2d 493).
 

 Defendant urges that the use of juror professional expertise, as in this case, to evaluate and contradict the testimony of trial experts, coupled with the sharing of such nonevidentiary
 
 *573
 
 based conclusions with fellow jurors, rises to the level of cognizable misconduct. Specifically, defendant argues that the two nurse-jurors became unsworn witnesses against him and that the communications of these jurors reflect a disregard of the trial court’s instructions which prejudiced defendant on a material, contested issue in this case.
 

 The People contend that defendant’s trial counsel was obliged to seek specific jury instructions or object to the instructions as given by the trial court in order to preserve this issue of law. They press the view that the trial court’s instruction that the jurors may utilize their “personal experience” in deciding the facts of the case entitled jurors with medical backgrounds to share their experiences and knowledge with the rest of the jury and to voice their opinions on the evidence. They also urge that defendant’s failure to object to the nurse-jurors’ prospective service on the jury, or to seek specific cautionary instructions at trial, constituted a waiver of the jury-verdict tainting claims.
 

 Generally, a jury verdict may not be impeached by probes into the jury’s deliberative process; however, a showing of improper influence provides a necessary and narrow exception to the general proposition
 
 (see, People v Brown,
 
 48 NY2d 388, 393;
 
 People v Testa,
 
 61 NY2d 1008, 1009). Improper influence includes even “well-intentioned jury conduct which tends to put the jury in possession of evidence not introduced at trial”
 
 (People v Brown, supra,
 
 at 393).
 

 CPL 330.30 (2) provides that, after the rendition of a verdict of guilty and before sentence, the court may, upon defendant’s motion, set aside the verdict upon the ground “[t]hat during the trial there occurred, out of the presence of the court, improper conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict.” Defendant argues that jurors who utilized their own expertise to compare their blood volume loss estimations with that of a defense expert and who shared their opinions of the medical consequences with the rest of the jury, engaged in prohibited conduct that is within the remedial reach of CPL 330.30 (2).
 

 This Court has noted, “[b]ecause juror misconduct can take many forms, no ironclad rule of decision is possible. In each case, the facts must be examined to determine the nature of the material placed before the jury and the likelihood that
 
 *574
 
 prejudice would be engendered”
 
 (People v Brown,
 
 48 NY2d 388, 394,
 
 supra).
 
 Each instance of juror misconduct must be analyzed with respect to its particular facts (see,
 
 People v Irizarry,
 
 83 NY2d 557, 561). The trial court is invested with discretion and posttrial fact-finding powers to ascertain and determine whether the activity during deliberations constituted misconduct and whether the verdict should be set aside and a new trial ordered (see,
 
 People v Testa,
 
 61 NY2d 1008, 1009,
 
 supra).
 

 We have generally examined juror misconduct in light of unauthorized visits by jurors to areas or crime scenes at issue (see,
 
 e.g., People v Crimmins,
 
 26 NY2d 319;
 
 People v De Lucia,
 
 20 NY2d 275), jurors’ improper reenactments of incidents (see,
 
 e.g., People v Legister,
 
 75 NY2d 832), or jurors’ performing “tests” to verify testimony at issue (see,
 
 e.g., People v Stanley,
 
 87 NY2d 1000). In assessing whether a particular activity rises to the level of misconduct, our calculus includes an appreciation that the complained-of conduct must be something more than an application of everyday experience, for that is precisely what peer jurors are instructed and expected to use in their assessment of evidence
 
 (see, People v Brown, supra,
 
 at 394).
 

 A reviewing court should also evaluate whether a juror’s or the jury’s conduct “created a substantial risk of prejudice to the rights of the defendant by coloring the views of the other jurors as well as her own”
 
 (id.).
 
 In
 
 Brown,
 
 the sole witness’ testimony linking the defendant with the crime was bolstered by a juror’s description of her unplanned “test.” We held that it was reasonable to assume that the jury might give her view extra weight
 
 (id.).
 

 A similar, grave potential for prejudice is also present here when a juror who is a professional in everyday life shares expertise to evaluate and draw an expert conclusion about a material issue in the case that is distinct from and additional to the medical proofs adduced at trial. Other jurors are likely to defer to the gratuitous injection of expertise and evaluations by fellow professional jurors, over and above their own everyday experiences, judgment and the adduced proofs at trial. Overall, a reversible error can materialize from (1) jurors conducting personal specialized assessments not within the common ken of juror experience and knowledge (2) concerning a material issue in the case, and (3) communicating that expert opinion to the rest of the jury panel with the force of private, untested truth as though it were evidence (id., at 395).
 

 
 *575
 
 The justification for this careful but fair rule originates from the awareness that jurors otherwise become “unsworn witnesses, incapable of being confronted by defendant,” and their expertise injects nonrecord evidence into the calculus of judgment which a defendant cannot test or refute by cross-examination
 
 (People v Stanley,
 
 87 NY2d 1000, 1001,
 
 supra).
 
 This kind of unauthorized conduct justifies a trial court in setting aside a verdict where the circumstances are evidently prejudicial to the defendant’s right to confrontation and cross-examination of witnesses
 
 (see, e.g., People v De Lucia,
 
 20 NY2d 275,
 
 supra).
 

 One of the layperson jurors in this case testified at the CPL 330.30 hearing that the nurse-jurors’ opinions directly aifected the verdict that the jury reached. The hearing evidence and this Court’s carefully calibrated precedents combine to support the remedial action, found necessary by the trial court in ordering a new trial.
 

 In passing, we note also the policy goals of recent jury reform measures that eliminated exemptions and facilitated the selection of professionals to jury pools comprising “a fair cross-section of the community” (Judiciary Law § 500, as amended by L 1995, ch 86, § 1; Judiciary Law § 509, as amended by L 1995, ch 86, § 2 [deleting references to exempted or disqualified persons]). This reform plainly contemplates that a class of professional individuals should contribute their “wisdom and life experiences to the deliberative process”
 
 (see,
 
 Kaye, Ch. J.,
 
 A Judge’s Perspective on Jury Reform from the Other Side of the Jury Box,
 
 36 Judges’ J [No. 4] 18, 21).
 

 Furthermore, we acknowledge that the knowledge and experience of jurors, who happen to be professionals of every type in everyday life, are brought in some part with them into the jury service and deliberations. It would be unrealistic to expect jurors to shed their life experiences in performing this important civic duty just because they are professionals. They may not, however, take the additional, forbidden step beyond the evidence of the cases before them. That would violate the rights of litigants to have their cases decided only on the evidence adduced, and would substitute these jurors’ own professional opinions in place of expert proofs adduced at trial. This substitution of professional opinion is fatal when shared with the rest of the jury. That combination produces reversible error because it goes beyond authorized limits and the commendable jury reform expectations. It instead injects nonrecord evidence into the jury’s deliberative process — a fundamental breach of
 
 *576
 
 standard operating evidence appraisal and trial adjudication. Indeed, such conduct compromises the integrity of the jury process, as would the introduction of ex parte communications or materials that are not part of tested evidence at trial.
 

 For these reasons it may be useful for trial courts to modify their standard instructions differentiating between ordinary and professional opinions of jurors, and directing that jurors may not use their professional expertise to insert facts and evidence outside the record with respect to material issues into the deliberation process
 
 (see, e.g., Fitzgibbons v New York State Univ. Constr. Fund
 
 [appeal No. 1], 177 AD2d 1033, citing
 
 People v Legister,
 
 75 NY2d 832, 833,
 
 supra; Alford v Sventek,
 
 53 NY2d 743, 745;
 
 People v Brown,
 
 48 NY2d 388, 393,
 
 supra; see also,
 
 Prince, Richardson on Evidence § 6-112 [b] [Farrell 11th ed]). That is not to say that the personal mental processes of any juror and credibility assessments, and the like, will be subject to postverdict impeachment. That is not this case, which goes far beyond those kinds of permissible activities and boundaries.
 

 We also observe that the Appellate Division’s rationale for its reversal, insofar as it rested on the voir dire selection of the jury, cannot stand. The voir dire activity cannot immunize juror misconduct at the deliberation stage. Although one of the nurse-jurors answered a voir dire question that her professional experience might affect what she believed regarding adduced medical evidence, and the defendant did not seek to disqualify her as a prospective juror on that basis, these circumstances cannot justify the later insertion of nonrecord opinion evidence into the jury’s consideration by communication during deliberations
 
 (compare, 23 Jones St. Assocs. v Beretta,
 
 182 Misc 2d 177 [App Term, 1st Dept]).
 

 We have considered all other arguments presented on both sides and are persuaded, for the reasons expressed in this opinion, that County Court was right to order a new trial.
 

 Accordingly, the order of the Appellate Division should be reversed and the order of County Court reinstated.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick, Wesley and Rosenblatt concur.
 

 Order reversed, etc.