[924 NYS2d 132]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v WARREN DAVIS, Appellant.

Second Department, May 24, 2011

APPEARANCES OF COUNSEL

*Diane E. Selker*, Peekskill, for appellant.

*Janet DiFiore, District Attorney*, White Plains (*Laurie Sapakoff, Richard Longworth Hecht*, and *Anthony J. Servino* of counsel), for respondent.

## OPINION OF THE COURT

HALL, J.

The principal issue on this appeal, stated narrowly, is whether a jury verdict may be impeached on the ground that the jury failed to apply the trial court's instructions on the law and, instead, relied on the "expertise" of a juror who was also an attorney, or, put another way, whether the alleged conduct of the lawyer-juror constituted "improper conduct" (*see* CPL 330.30 [2]). Resolving this issue highlights the difficulty—perhaps futil-

ity—in drawing meaningful distinctions between jurors' professional expertise and life experience.

The defendant was charged with numerous crimes, including murder in the second degree (felony murder), robbery in the first degree, and burglary in the first degree, arising out of the fatal shooting of Neville Brett on June 29, 2007, on West Fourth Street in Mount Vernon. After a suppression hearing, the defendant and one of his three codefendants, Lloyd Braham, were tried simultaneously before separate juries.

As presented at trial, the evidence established that Neville Brett, a graphics artist, lived with his brother, Michael Brett, a part-time marijuana dealer, in a basement apartment on West Fourth Street, along with two other men, one of whom was Delroy Melbourne.

On the evening of June 29, 2007, Braham and one of Braham's acquaintances, Demar Bryant, told the defendant that there was a large quantity of marijuana at 138 West Fourth Street and suggested that they take it, and beat up Michael Brett if he resisted. At first, the defendant said he wanted nothing to do with the scheme and walked away. Nevertheless, later in the evening he again met with Bryant and Braham, as well as with Carlos Jean-Baptiste, and the men agreed to commit the robbery.

Between 10:00 P.M. and 11:00 P.M., a fifth man, Andrew Crewe, transported the defendant, Braham, Bryant, and Jean-Baptiste in his sport-utility vehicle and dropped them off near 138 West Fourth Street. The defendant was handed a gun. The defendant and Braham walked together to the house, but separately from Bryant and Jean-Baptiste, who went downstairs and into the apartment. At some point, the defendant gave his gun to Jean-Baptiste.

Bryant and Jean-Baptiste, with their faces mostly obscured by kerchiefs and hoods, went into Michael Brett's bedroom. Jean-Baptiste removed a gun from a bag, and Bryant likely also had a gun. Bryant stated, "it's going to be a massacre," and Jean-Baptiste announced a robbery. Michael gave Jean-Baptiste a bag containing about three-fourths of a pound of marijuana, and Jean-Baptiste jammed his gun into Michael's chest and told him to get down on the ground. Another occupant of the apartment, George McDaniel, was pushed to the ground as well. Jean-Baptiste and Bryant ransacked the room and also took cash from Michael's and McDaniel's pants pockets. Bryant ordered Jean-Baptiste to "go for the next dread" and Jean-Baptiste,

possibly assisted by the defendant, left the bedroom and returned with Neville Brett and pushed him to the ground. Bryant continued to give Jean-Baptiste orders, telling him "if any of those Rastas move, kill them." Bryant took out his cellphone and told Jean-Baptiste that he was going to "call in the crew." Up to that point, according to eyewitness testimony, the defendant had either looked into the room or had come inside.

At Bryant's direction, the defendant brought Delroy Melbourne from outside the building into the apartment, and Melbourne was pushed to the ground. Outside the apartment, the defendant and Braham decided to leave, and started walking away. Inside the apartment, Bryant and Jean-Baptiste left the bedroom briefly, and Bryant told Jean-Baptiste to "shoot him" and "go finish it." Jean-Baptiste reentered the room, walked directly to where Neville was lying on the floor, and shot him once in the back, killing him. Braham and the defendant heard the shot as they walked past the outside gate. Bryant, Jean-Baptiste, the defendant, and Braham then fled.

The defendant was arrested one month later and gave varying accounts of the incident, including one that was videotaped, insisting that he had participated only reluctantly, but admitting that no one had forced or threatened him to participate. He also admitted having received a share of the proceeds of the robbery. The defendant testified before the grand jury, and his testimony was read into the record at trial. The defendant also testified at trial in his own defense and gave an account minimizing his participation.

The jury considering the case against the defendant commenced its deliberations shortly after noon on May 15, 2008. Over the course of that day and the next morning, the jury sent the Trial Judge a series of notes requesting readbacks of the defendant's grand jury testimony, which it later limited to a particular portion of that testimony, as well as his trial testimony. The jury also asked to view the defendant's videotaped statement, and to be reinstructed on the elements of the charged crimes, as well as on the law pertaining to acting in concert and the affirmative defense of duress. The jury notified the Trial Judge at 1:00 P.M. on May 16, 2008, that it had reached a verdict. The jury found the defendant guilty of all 12 counts submitted.

Before sentencing, the defendant filed a written motion to set aside the verdict, inter alia, pursuant to CPL 330.30 (2), on the ground of juror misconduct. In support of the motion, he submitted a sworn statement of one juror (hereinafter Juror E) which

alleged that Juror E and several other jurors had come to the conclusion that the defendant was not guilty of robbery, burglary, or murder, but that another juror (hereinafter Juror R), who was a real estate attorney, told the jurors that "we had to find [the defendant] guilty of all of the charges or not guilty of all of the charges," and that "because [the defendant] was present we had to find him guilty." Juror E further stated that "[w]e relied on his instructions about the law because he was an attorney, and based on his instruction we reached our verdict." In further support of the motion, the defendant submitted three different letters from a third juror (hereinafter Juror P), one to the prosecutor, one to defense counsel, and one to the County Court. Juror P's letters, which were not sworn, described the substance and tenor of the deliberations. The letters did not repeat Juror E's allegations regarding Juror R, but the letter to defense counsel stated: "The problem most of us had was that the law was so INFLEXIBLE and never allowed any loopholes. It was either all the charges or none."

In opposition to the defendant's motion, the People submitted, inter alia, Juror P's letter to the prosecutor, as well as a letter from Juror R, the attorney, in which he pleaded for mercy in the sentencing of the defendant. Juror R stated: "unfortunately, I don't think we had any choice but to find [the defendant] guilty of all charges given the facts, his own statements and given the application of the Felony Murder Rule." He also stated that there was "no doubt in my mind that [the defendant] never intended for a violent crime to occur that night. I realize that that is irrelevant as far as Felony Murder is concerned but I hope that it is taken into account when sentencing is determined."

The People argued that the defendant's allegations as to juror misconduct did not warrant a hearing because the alleged improprieties did not fall within the exception to the settled rule forbidding inquiry into the tenor and content of jury deliberations. The County Court summarily denied the defendant's motion, finding that nothing alleged in either the sworn statement or the unsworn letters would fall outside of the rule forbidding inquiry into the tenor or content of jury deliberations. On July 19, 2008, the County Court sentenced the defendant to concurrent indeterminate and determinate prison terms totaling 19 years to life. The determinate terms included five-year periods of postrelease supervision. The defendant appeals, raising several claims.

■ To prevail ultimately on his claim regarding the alleged misconduct of Juror R, the defendant was required to establish that Juror R's alleged conduct constituted "improper conduct by a juror . . . which may have affected a substantial right of the defendant" (CPL 330.30 [2]). Preliminarily, we note that the issue at this stage is not whether the County Court should have granted the motion, but whether it improvidently exercised its discretion in denying it without holding a hearing. In this respect, we note that, as the court correctly observed, the letters from Juror P were not sworn (*see* CPL 330.40 [2] [a]; *People v Brunson*, 66 AD3d 594, 596 [2009]; *People v Lopez*, 104 AD2d 904, 905 [1984]). Nonetheless, the County Court had the discretion to consider those letters in determining whether to hold a hearing (*see* CPL 330.40 [2] [f]; *cf.* 330.40 [2] [d], [e] [ii]). It found, however, nothing in the letters, or in the sworn statement of Juror E, warranted a hearing. With these procedural observations in mind, we now turn to the merits of the defendant's claim.

"[T]he leavening accomplished by the application of a lay jury's collective intelligence and experience to the tasks of sifting evidence and reaching a verdict is justly regarded as a hallmark of our judicial system" (*People v Brown*, 48 NY2d 388, 393 [1979]). Thus, it is not expected that jurors should decline to use their "cognitive functions" (*id.*). To adopt rules that have the effect of discouraging jurors from using their wisdom would remove an essential underpinning of the justification for our pride in the jury system.

■ It has long been the law that, with narrow exceptions, jury verdicts may not be impeached by "probes into the jury's deliberative process" (*People v Maragh*, 94 NY2d 569, 573 [2000]; *see McDonald v Pless*, 238 US 264, 267 [1915]; *People v Brown*, 48 NY2d at 393; *People v De Lucia*, 15 NY2d 294, 296 [1965], *cert denied* 382 US 821 [1965]). This general rule forbids, at its core, inquiry into the "tenor" of the deliberations (*People v Brown*, 48 NY2d at 393). Nevertheless, inquiry may be made into "improper influence" (*id.*; *see People v Maragh*, 94 NY2d at 573; *Alford v Sventek*, 53 NY2d 743, 744-745 [1981]). The Court of Appeals has, however, recognized the difficulty of defining "improper influence":

"This court has declined to fashion any concrete test for assessing claims for improper jury influence. 'Because juror misconduct can take many forms, no ironclad rule of decision is possible. In

each case the facts must be examined to determine the nature of the material placed before the jury and the likelihood that prejudice would be engendered' " (*People v Testa*, 61 NY2d 1008, 1009 [1984], quoting *People v Brown*, 48 NY2d at 394).

"Improper influence . . . embraces not merely corrupt attempts to affect the jury process, but even well-intentioned jury conduct which tends to put the jury in possession of evidence not introduced at trial" (*People v Brown*, 48 NY2d at 393; *see generally People v Arnold*, 96 NY2d 358, 364-365 [2001]). Improper influences have been found to include, for example, statements to jurors of opinion by court personnel as to the defendant's guilt (*see e.g. Parker v Gladden*, 385 US 363, 364 [1966]), unauthorized juror visits to the scene of the crime to reenact it (*see e.g. People v De Lucia*, 20 NY2d 275, 279 [1967]), juror experiments as to timing, lighting conditions, or ability to see from certain vantage points (*see e.g. People v Stanley*, 87 NY2d 1000, 1001 [1996]; *People v Legister*, 75 NY2d 832, 832-833 [1990]; *People v Brown*, 48 NY2d 388 [1979]), a juror's independent translation of a letter in evidence written in a language other than English (*see e.g. People v Flores*, 282 AD2d 688, 689 [2001]), a juror's relay of particular information from outside the jury about the defendant's guilt or innocence (*see e.g. People v Giarletta*, 72 AD3d 838, 839 [2010]), and statements by a court officer serving on a jury as to the legal impropriety of another juror's note-taking during deliberations (*see People v Gibian*, 76 AD3d 583, 587-588 [2010]).

When the alleged impropriety is not a juror's actual conduct, but the juror's use of experience or knowledge preexisting his or her jury service, the problems become manifold. In *People v Maragh* (94 NY2d 569 [2000]), a homicide case, two jurors, both nurses, used their professional expertise to calculate the victim's blood loss. Their resulting conclusions contravened the expert testimony presented on the defendant's behalf and the theories both sides presented at trial, and they communicated their findings with the other jurors. The Court of Appeals found this to have been an "improper influence," and reversed the conviction. In attempting to formulate a workable rubric for what constitutes misconduct based on a juror's application of his or her own knowledge, the Court stated, "our calculus includes an appreciation that the complained-of conduct must be something more than an application of everyday experience, for that is precisely what peer jurors are instructed and expected to use in their assessment of evidence" (*id.* at 574). It then stated that there is "grave potential" for prejudice when:

"a juror who is a professional in everyday life shares expertise to evaluate and draw an expert conclusion about a material issue in the case that is distinct from and additional to the medical proofs adduced at trial. Other jurors are likely to defer to the gratuitous injection of expertise and evaluations by fellow professional jurors, over and above their own everyday experiences, judgment and the adduced proofs at trial" (*id.*).

The Court then stated:

"Overall, a reversible error can materialize from (1) jurors conducting personal specialized assessments not within the common ken of juror experience and knowledge (2) concerning a material issue in the case, and (3) communicating that expert opinion to the rest of the jury panel with the force of private, untested truth as though it were evidence" (*id.*).

These excerpts beg the question of what distinguishes permissible "everyday experience" from impermissible juror "expertise," and fail to recognize that, in our modern world, many lay people have what might be considered specialized knowledge about many things (*see People v Arnold*, 96 NY2d at 364). For example, a former drug addict serving on a jury may have particular knowledge as to quantities of drugs consistent with personal use in a case in which expert testimony is presented on the subject by a witness (*cf. People v Hicks*, 2 NY3d 750, 751 [2004]). Likewise, many people may know of the problems with eyewitness identifications (*see e.g.* Zernike, *Study Fuels Debate Over Police Lineups*, New York Times, Apr. 19, 2006, available at http://www.nytimes.com/2006/04/19/us/19lineup.html), but the Court of Appeals has recently held that a court may nevertheless allow expert testimony on the subject (*see People v LeGrand*, 8 NY3d 449 [2007]).

In many cases, a juror with professional, or even a merely personal, interest in a subject may disagree with the testimony of the expert. In that event, it seems that the juror will need to make a determination whether his or her own knowledge may be properly shared with the other jurors, or even utilized in his or her own evaluation of the case. Even if the knowledge may not be shared, the juror must then decide whether it can be used even in his or her own evaluation of the expert's testimony, or, perhaps, in explaining to the other jurors why he or she finds, or does not find, the expert's testimony to be convincing

(*see* Fisher, Outside Counsel, *The Continuing Problem of Juror Expertise*, NYLJ, May 2, 2003, at 4, col 4).* The Court of Appeals attempted to address these concerns in *People v Arnold* (96 NY2d 358 [2001]), reasoning that

> "*Maragh* and our other precedents . . . require . . . that jurors not engage in experimentation, investigation and calculation that necessarily rely on facts outside the record and beyond the understanding of the average juror. This applies equally if the jury conducts unauthorized experiments at the crime scene, or if an 'expert' juror performs 'expert' scientific analysis—requiring knowledge of facts beyond those presented at trial—and convinces the other jurors to disregard the trial testimony and instead rely on his expertise" (*id.* at 367).

To the extent that *Arnold* emphasizes that jurors may not use "calculation" that relies on *facts* outside the record and beyond the understanding of the average juror, it may clarify matters (*see People v Santi*, 3 NY3d 234, 249 [2004]) and encourage juries to aspire to use their collective wisdom, gained from the education and life experiences of each individual juror. That is the goal of the jury system (*see People v Maragh*, 94 NY2d at 575).

Moreover, we may frankly acknowledge, whether as a matter of probability, human nature, or empirical study, that juries are sometimes wrong. No system is perfect. The best we can hope for is the highest level of accuracy that may be achieved when wise rules are followed by participants striving to do their best. Indeed,

> "it is a fundamental assumption of our system of trial by jury that, after the presentation of evidence and argument by counsel, the jury will apply the

---

* Jurors are commonly instructed:

> "In deciding whether or not to accept [an expert's] testimony, you should consider the following:
>
> "the qualifications and believability of the witness;
>
> "the facts and other circumstances upon which the witness's opinion was based;
>
> "[the accuracy or inaccuracy of any assumed or hypothetical fact upon which the opinion was based;]
>
> "the reasons given for the witness's opinion; and
>
> "whether the witness's opinion is consistent or inconsistent with other evidence in the case" (CJI2d[NY] Expert Witness).

law to the facts to reach a proper and reasoned verdict. This, in turn, assumes that the jurors will understand the law as it is explained to them by the [trial] court. Without clear and concise legal instructions, a jury cannot hope to achieve such an understanding and will be left to determine the law for itself.

"To avoid that result, the Committee on Criminal Jury Instructions continues to have as its principal objective the production of jury charges that correctly and concisely state the law in a way that lay jurors can understand. Little is more important to the success of our criminal justice system" (Steven W. Fisher, *Pattern Instruction For Jurors In Criminal Cases Seek To Explain Fundamental Legal Principles*, 73 NY St BJ 29, 30-31 [June 2001]).

Turning now to the case before us, it is clear that Juror R did not inject into the jury's deliberation any extra-record experimentation, investigation, or calculation that relied on facts outside the record and beyond the understanding of the average juror. Rather, as is clear from the statements and letters of Juror E, Juror R, and Juror P, all of the jurors took their responsibilities seriously and strived for a result in accordance with the evidence and the law. If Juror R's understanding of the law was incorrect, that would not constitute "improper conduct" within the meaning of CPL 330.30, just as an incorrect understanding of the law by any other juror and applied by the jury would not constitute improper conduct, even in instances where jurors have purposely disregarded the trial court's instructions as to the law (*see People v Camacho*, 293 AD2d 876, 877 [2002]; *cf. Edbauer v Board of Educ. of N. Tonawanda City School Dist.*, 286 AD2d 999, 1001 [2001]). The law, as explained by the court, cannot then constitute "specialized knowledge."

Moreover, jury deliberations, of course, are not transcribed, which is another circumstance in this case highlighting why conduct of the sort alleged here on the part of Juror R should not be considered "improper conduct." When 12 people are talking about anything, certain things they say will be wrong, vague, misunderstood, or even merely misheard. To try to reconstruct, with any reliability, a jury's deliberations with an eye toward finding out what exactly was said, meant, understood, or heard, and then evaluating it against something so precise as a legal charge, would be nearly impossible. Here,

viewed in light of the jury requests and the ambiguity of the give-and-take of spoken language, the alleged misstatements of law attributed to Juror R were very likely not misstatements at all. The defendant was not being tried for any crime that contained as an element the intent on the part of any participant to hurt anyone. Under the actual facts of this case, so long as the defendant was acting in concert in the robbery and the burglary, he was guilty of every charge of murder, robbery, and burglary. Thus, the statement attributed to Juror R that the defendant was guilty of all of the crimes or none of them was accurate. For that reason, the jury's requests for readbacks and recharges made perfect sense. The jury's request for reinstruction on duress and acting in concert was intended to help it cement the legal framework for evaluating whether the defendant could be convicted of any of the crimes, and its request for readbacks of the defendant's own testimony in the grand jury and at trial was likely intended to help it determine the facts that it would evaluate within that framework. The jury would not have needed any of the readbacks or reinstruction if it were under the misimpression that the defendant's mere presence was enough to convict him of the crimes.

Finally, we observe that none of the three jurors was happy about the result; all—especially Juror R and Juror P—expressed extreme sympathy for the defendant and wished for leniency for him at sentence. Juror R, the attorney, spoke of the inflexibility of the felony murder rule. In sum, what we see in this case is not misconduct but, as best as can be determined from the record, a jury striving conscientiously to do its job.

Accordingly, we conclude that, contrary to the defendant's contention, the Supreme Court did not improvidently exercise its discretion in summarily denying that branch of his motion which was to set aside the verdict on the ground of juror misconduct (see CPL 330.30 [2]).

The defendant's challenge to the sufficiency of the evidence, and his claim that the verdict was against the weight of the evidence, are without merit. Viewing the evidence in the light most favorable to the prosecution (see People v Contes, 60 NY2d 620, 621 [1983]), we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt. Moreover, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (see CPL 470.15 [5]; People v Danielson, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the

testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383, 410 [2004], *cert denied* 542 US 946 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

The sentence imposed was not excessive (*see People v Suitte*, 90 AD2d 80 [1982]).

The defendant's remaining contention is without merit (*see People v Lora*, 176 AD2d 273 [1991]).

Accordingly, the judgment is affirmed.

ANGIOLILLO, J.P., BELEN and AUSTIN, JJ., concur.

Ordered that the judgment is affirmed.