*500 OPINION OF THE COURT
Michael Gerstein, J.
Following a trial on two counts of criminal contempt in the second degree (Penal Law § 215.50 [3]), defendant Joel Kolko was acquitted by the jury, which returned its verdict within 10 minutes of the case being submitted for deliberation. The following day, the District Attorney, after being contacted by two persons present in the courtroom during the trial, asked the court to conduct an inquiry of Juror No. 6 and the mother of that juror, who had also been present in court during the trial, as to possible improprieties. By separate motion, the People asked the court to stay sealing of the case to allow for investigation. For the reasons set forth below, the court finds that the People have not shown sufficient basis to breach the wall of juror confidentiality, and denies the People’s motions.
Background and Prior Proceedings
In 2007, defendant, an elementary school teacher at Yeshiva Torah Temimah in Brooklyn, was indicted for allegedly sexually abusing (Penal Law § 130.65) F., who had been a student in defendant’s first grade class. In 2008, defendant pleaded guilty in Supreme Court, Kings County, to two counts of endangering the welfare of a child (Penal Law § 260.10), a class A misdemeanor, in satisfaction of the felony indictment as well as a second indictment, and was sentenced to three years’ probation, and a final order of protection requiring him to stay away from F. Subsequently, defendant was arrested on the instant misdemeanor complaint, charging him with contempt for two separate occasions (Nov. 5, 2010 and Nov. 12, 2010) where he allegedly violated the Supreme Court order of protection. Trial commenced before me on June 18, 2012, with selection of a jury and pretrial motions.
The Trial
The court made several significant rulings prior to commencement of voir dire. The People made Sandoval[1] and Molineux[2] applications, which sought to bring to the jury’s attention the details of defendant’s convictions for endangering the welfare of a child, and defendant’s pending charge of violating his probation by allegedly traveling to upstate New York without first *501 obtaining permission. Holding that the prejudice to defendant would outweigh the probative value of the details of the convictions, the court ruled that should defendant testify, the People could ask, on cross-examination, only if he had been convicted of crimes or misdemeanors, without specifying the crime or mentioning the underlying factual allegations of sexual abuse. The court was advised that the underlying allegations were also the subject of a civil suit, albeit against the Yeshiva rather than defendant, based upon the claim that defendant sexually abused E, for which large monetary damages were sought on grounds of negligent hiring, supervision and/or retention of defendant. The court permitted inquiry into the existence of the civil lawsuit (defense counsel ultimately chose not to cross-examine as to the civil suit), and ruled that there was to be no mention of its factual allegations regarding sexual abuse, but that the parties were to mention only “allegedly wrongful acts purportedly committed by Defendant against E,” without specification that those acts were sexual in nature.
The trial was vigorously prosecuted and defended. Because the matters regarding defendant (both the earlier cases and the current case) were the subject of newspaper and other media coverage, several venirepersons who were familiar with defendant or the charges against him, either from the media or from community discussions, were excused. In addition, at the request of defense, counsel were given additional time, the amount of which they agreed was sufficient, beyond that ordinarily allowed by the court, for voir dire to ferret out any bias of potential jurors. A jury and alternates were then chosen over a period of two days.
The case involved two alleged violations of the order of protection. On November 5, 2010, defendant was alleged to have violated the order by walking up to F. and his father, passing F. “shoulder to shoulder,” and saying “good shabbos” or “good sabbath.” Defendant was alleged to have again violated the order on November 12, 2010, by staring at E, then 12 years old, for a period between 90 seconds and two minutes, with defendant’s arms purportedly folded in front of him. Both alleged violations were claimed to have occurred as F. and his father were walking to synagogue just prior to sunset to observe the oncoming Sabbath, as they did virtually every Friday.
The testimony established that defendant’s residence was very near that of F. and his family, and is located on the shortest and most direct route from F.’s house to his synagogue. F.’s *502 father testified that because he has difficulty walking, it was impractical for him to utilize a longer route that would not bring F. past defendant’s residence. F. testified that on various occasions, he would pass defendant’s residence without incident on the way to his friend’s house, in addition to the many times he passed on the way to synagogue without encountering defendant.
In his opening, defense counsel argued, among other things, that this case was analogous to popular cartoons with a cat and a mouse, except here the mouse was chasing the cat. This analogy was repeated in summation, with counsel arguing that F.’s family was using this case as a vehicle to get defendant out of their neighborhood. The groundwork for this argument was pursued with vigor upon cross-examination of F.’s father who was physically present walking with F. on both dates at issue and testified as a prosecution witness.
Following the father’s testimony, the People sought to have the court reconsider its Molineux/Sandoval rulings, arguing that the cross-examination of the father as to motive, coupled with defense counsel’s opening argument as to the “cat and mouse,” opened the door and made it imperative, to prevent jury speculation and confusion, that the jury be informed as to the specifics of defendant’s convictions if not the underlying allegations of defendant’s sexual abuse of F. If the jury had knowledge of these specifics, it would dispel the notion that F.’s family was engaged in a vendetta against defendant, or was merely hypersensitive. The court declined to hold that the cross-examination and defense opening statement opened the door to introduction of these specifics.
While mention of the sexual abuse charges was prohibited by the court, the People established, through F, that defendant had been his first grade teacher in 2006. The court denied defendant’s motion for a mistrial, which asserted that such testimony violated the spirit of the court’s pretrial rulings and prejudiced defendant in light of the media publicity regarding not only defendant, but other cases where teachers were charged with sexually abusing their students. After denial of defendant’s motion for a mistrial, defense counsel introduced into evidence the class photograph of F.’s first grade Hebrew Studies class, showing defendant as the teacher and F. among the students.
The People presented the testimony of E; his father; the arresting officer; an investigator who testified as to a street map he created showing the respective residences of F. and defend *503 ant, as well as the synagogue towards which F. and his father were walking on the dates at issue; and a Clerk of Supreme Court, Kings County, to provide the foundation for introduction into evidence of the order of protection. The court denied defendant’s motion for a trial order of dismissal, holding that the evidence presented was sufficient to make a prima facie case. Defense counsel, although previously indicating that he might call as many as 10 witnesses, including the third individual walking with F. and his father on the November 12 incident (all of whose names were read to the jury as part of the court’s voir dire), rested without calling any witnesses.
During the trial, the court carefully instructed the jurors, at every recess, that they were forbidden from discussing the case among themselves and with anyone else until the case was submitted to them for deliberations, that they were to ignore any of the parties, lawyers, and the court itself should they encounter them during recess, that they were not to go to the scene or conduct any research, and that they must not read or view any publicity about the case. The parties and counsel were similarly instructed not to communicate with any jurors. Moreover, due to pretrial publicity concerning defendant, the court obtained a specific pledge from each juror to refrain from conducting any Internet research regarding any of the parties, witnesses, or counsel on the case.
After a day’s recess due to the absence of Juror No. 3, and over the objections of defense counsel, who requested that Juror No. 3 immediately be discharged, an alternate be seated and summations commenced forthwith, extensive summations were given by counsel upon the return of Juror No. 3 the next morning. (Defense counsel’s summation lasted more than one hour.) In addition to the “cat and mouse” argument, defense counsel argued lack of intent, an element of contempt, as evidenced by the many times F. walked past defendant’s residence without incident. The People’s summation included a vivid demonstration where the prosecutor remained silent before the jury, without objection from defense counsel, while timing 90 seconds on her watch to give the jury the feeling of being stared at for that period of time, as F. testified the defendant did on November 12, 2010.
The court repeatedly reminded the jury that it could request the exhibits, particularly the order of protection, and did not have to rely on the claims of counsel as to its language. Following the court’s charge, the jury returned its verdict within 10 *504 minutes, without requesting any exhibits, finding the defendant not guilty on both counts. At the court’s initiative, the jury was polled, and each juror individually confirmed the verdict.
The court then expressed its thanks to the jurors for their service, and advised the jurors, as well as the alternates, that they could now speak freely regarding the case. The court, being aware of press coverage of the trial, further advised the jurors that they were also free to refrain from speaking, as they each sought fit. The court did not grant anyone any special access to the jurors after dismissing them.
The next day, the court received a letter from the Assistant District Attorneys dated June 26, asserting that two people, Ben Hirsch and Helia Winston, had witnessed certain events which gave rise to concern as to possible juror misconduct with regard to Juror No. 6. The court directed that a hearing be held as to whether to require testimony from Juror No. 6 and her mother.
The Posttrial Hearing
At the hearing, held on July 2, 2012, Mr. Hirsch, who described himself as an advocate for victims of sexual abuse in the Orthodox Jewish community (hearing tr at 26, July 2, 2012), and who had been following defendant’s case since 2006 (tr at 27), testified that he had been present in the court for most of the trial, and had observed a woman, whom he initially thought to be a member of the defense team but learned after the verdict to be the mother of Juror No. 6, in a “spirited conversation” with the defendant in the hallway outside of court on the final day of trial before summations. (Tr at 20.) Mr. Hirsch explicitly and repeatedly stated that he did not hear any of their conversation (tr at 31, lines 3-24), but that
“[t]hey appeared to know each other very well. There is a dynamic that exists between two people who are comfortable with each other, who know each other well, and that was the impression that I got, and the thing that struck me as odd was, this is difficult to explain, the contrast between the sort of intimacy of the moment, the clear connection of the two, and the fact that a Rabbi is engaged in a close intimate conversation with a woman who was clearly secular or sleeveless, that is what struck me as odd.” (Tr at 21, line 19 through 22, line 2.)
Mr. Hirsch testified that he followed Juror No. 6 and her mother for two avenue blocks as they left the building, repeat *505 edly asking the mother if she was related to a juror. He continued to follow her and question her after she asked to be left alone, and after a newspaper reporter who was initially with Mr. Hirsch dropped his pursuit (tr at 37), notwithstanding that it became obvious to Mr. Hirsch that the juror was frightened by his pursuit.
“Q. [by Assistant District Attorney Doerfler]: Was the juror saying anything during this exchange?
“A: She just looked very frightened. She wasn’t saying anything.
“Q. When you say frightened, can you describe that for us.
“A: She was running forward, turning back, running forward, just turning her head back. She was trying to get away from this.” (Tr at 38, line 25 through 39, line 6.)
The court, with the consent of counsel (tr at 19, lines 4-9), followed up as follows:
“The Court: .... The first time you asked [the juror’s mother] if she was related to the juror, she said, ‘Leave me alone’?
“The Witness: Yes.
“The Court: And you followed her from Smith Street to Boerum Place, And from Boerum Place to Court Street?
“The Witness: Yes.
“The Court: This would be on State Street or Schermerhorn?
“The Witness: Schermerhorn.
“The Court: For two avenue blocks, you did not leave her alone?
“The Witness: I did not.” (Tr at 39, lines 12-23.)
“The Court: Why did you feel you had the right to follow this woman two blocks down the street after she told you to leave her alone?
“The Witness: I was speaking with her and asking her questions.
“The Court: You are not answering my question.
The first time you asked her, you told me her response was to leave her alone. Why did you not do what she asked and feel that you had the right to follow her for two avenue blocks, to pursue her and her daughter and whoever else she was with?
*506 “The Witness: I didn’t think there was anything that precluded me from doing so.” (Tr at 40, lines 8-20.)
Mr. Hirsch further testified that he was a critic of the District Attorney with regard to prosecution of cases involving sex abuse within the Orthodox community, and specifically with regard to defendant; that he was not happy with the disposition given defendant on the underlying case; that he had publicized his dissatisfaction to the media; and that he was disappointed with the verdict in this case. (Tr at 28-29.) He also conceded that while he had attended high school and some college, he was not an expert in body language, psychology or the like (tr at 29, lines 4-11), and that he had not witnessed any misconduct whatsoever by any juror, or any conversation between a juror and defendant or any member of the defense team. (Tr at 31, lines 3-24.) When asked by the court if he would have reported his observations had the jury convicted defendant, he replied: “I’d like to believe that, yes I would. . . . That would have been a test. I hope I would have stood up and reported it.” (Tr at 41, lines 1-4.)
The People’s second proposed witness at the hearing, Helia Winston, is an award-winning freelance reporter whose stories on sexual abuse in the Orthodox Jewish community, including stories regarding defendant, appear in the New York Jewish Week. (Ms. Winston won Honorable Mention in the 2012 Casey Medals for Meritorious Journalism for these stories [see The Jewish Week at 9, July 6, 2012].) After consultation with counsel, she declined to testify, citing the reporter’s Shield Law, Civil Rights Law § 79-h. However, given the People’s offer of proof as to her testimony, the court finds that her testimony would not affect the court’s decision. The offer of proof was that Ms. Winston “did not observe the mother speaking with Defendant’s family or the Defendant. Her interaction was that when she attempted to speak with the juror and her mother, they refused to speak with her and basically ran away from her.” (Tr at 5, lines 1-5.)
Legal Standard
Post-verdict juror inquiries are matters that courts disfavor and have long sought to avoid. (See Tanner v United States, 483 US 107, 120 [1987].) These inquiries raise a host of unnecessary evils, among them, exposing jurors to posttrial harassment, causing some to second-guess an otherwise procedurally suf *507 ficient verdict and thereby interfering with the sacrosanct nature of jury deliberations. Our judicial system has recognized the need to severely limit posttrial juror inquiries, because if these attacks on “solemnly made and publicly returned” verdicts were so readily allowed, “(jjurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict.” (McDonald v Pless, 238 US 264, 267 [1915].)
In New York, “a jury verdict may not be impeached by probes into the jury’s deliberative process; however, a showing of improper influence provides a necessary and narrow exception to the general proposition.” (People v Maragh, 94 NY2d 569, 573 [2000]; see also People v Brown, 48 NY2d 388, 393 [1979].) The Court of Appeals has also noted that “as a matter of policy, efforts to undermine a jury’s verdict by systematically questioning the individual jurors long after they have been dismissed in hopes of discovering some form of misconduct should not be encouraged.” (People v Friedgood, 58 NY2d 467, 473 [1983].)
Generally, improper influences, or “[e]xtraneous influences,” constitute “juror exposure to prejudicial information not admitted into evidence.” (People v Giuca, 23 Misc 3d 1104[A], 2009 NY Slip Op 50577[U], *5 [Sup Ct, Kings County, Apr. 1, 2009], affd 78 AD3d 729 [2d Dept 2010].) A general claim of improper juror influence will not suffice; “absent a specific showing of improper influence, a jury verdict [should] not be impeached.” (See People v Irizarry, 83 NY2d 557, 561 [1994].)
To assess an allegation of juror misconduct, a trial judge must examine “[e]ach case ... on its unique facts to determine the nature of misconduct and the likelihood that prejudice was engendered.” (People v Clark, 81 NY2d 913, 914 [1993].) A trial judge has “broad discretion in ruling on the issue of juror prejudice.” (People v Martin, 177 AD2d 715, 716 [2d Dept 1991].) The court in Giuca laid out the standard in evaluating whether a further inquiry is needed: “[A] post-trial evidentiary hearing into alleged juror misconduct or extraneous influence is required only when a party comes forward with clear, strong, substantial and incontrovertible evidence . . . that a specific, non-speculative impropriety has occurred.” (2009 NY Slip Op 50577[U], *6, quoting United States v Sattar, 395 F Supp 2d 66, 73 [SD NY 2005].) In Giuca, the court “perform[ed] a balancing act” weighing the important policy of protecting jurors from posttrial harassment against the defendant’s right to a fair trial. (Giuca, 2009 NY Slip Op 50577[U], *5.)
*508 Verdicts have been set aside for a host of reasons predicated on juror misconduct. (See e.g. Parker v Gladden, 385 US 363 [1966] [bailiffs improper statements to two jurors referring to defendant’s guilt deemed sufficiently prejudicial to overturn conviction]; Remmer v United States, 347 US 227 [1954] [offer of a bribe to find defendant not guilty by unknown individual to juror deemed sufficiently prejudicial to overturn conviction]; Tableporter v Urist, 157 Misc 347 [Mun Ct, Bronx County 1935] [son of a juror asked defendant for job during trial].) Notably, the courts in these cases found that further inquiry of jurors was warranted based on the seriousness of the allegations of misconduct as well as the specificity of the claims. As the Court of Appeals has stated, we need a “specific showing of improper influence” (Irizarry, 83 NY2d at 561 [emphasis added]), and evidence of a “specific, non-speculative impropriety.” (Giuca, 2009 NY Slip Op 50577[U], *6 [emphasis added].)
Analysis
No case has been cited where the prosecution, after a verdict of acquittal, has succeeded in obtaining a new trial on grounds of juror misconduct. Nevertheless, we assume, without deciding, that the prosecution is as much entitled as the defense to an impartial jury free of improper influence or misconduct.[3] Inasmuch as the only relief presently sought by the People is a hearing for Juror No. 6 and her mother to be questioned as to possible misconduct, the court has no occasion to reach constitutional and other issues that would necessarily have to be decided in order to direct a new trial based on juror misconduct discovered after the jury reached a verdict of not guilty. For purposes of this opinion, the court will analyze the People’s application to question the juror and her mother under the same standard applicable to defense applications for such questioning following a conviction.
Breaking down the actions purported to raise issues as to juror impropriety, the court finds that none of the alleged acts, by themselves, are sufficient to require the testimony of Juror No. 6 or her mother. Proceeding chronologically, the first act is the presence of Juror No. 6’s mother in court during the trial. During the trial the mother’s presence was brought to the court’s attention. As the Constitution requires that trials be *509 public, subject to limited exceptions not applicable herein,[4]
[5]the court declined to take any action to exclude the mother.[6] Moreover, neither the People nor defense counsel requested that the mother be excluded, but merely that the court be aware of her presence.
Next it is alleged, by the testimony of Mr. Hirsch, that the juror’s mother was engaged in a “spirited” or “intimate” conversation with the defendant. The court credits Mr. Hirsch’s testimony as to the existence of the conversation. However, as the juror’s mother was not herself a member of the jury, the mother was not subject to any restrictions as to with whom she could converse. And, while conversations wherein the juror’s mother sought benefits from the defendant, or the defendant sought to use the mother to influence the juror would surely provide grounds to require further testimony, Mr. Hirsch concededly did not hear a single word of the conversation (tr at 31, lines 18-24), and there is no evidence of any improper conversation.
Without any testimony as to the substance of this conversation, it would be pure speculation that the substance of the conversation was not only prejudicial, but that the mother’s opinion of the defendant thereby tainted the juror’s impartiality. To question the juror under this speculation would be to “probe[ ] into the jury’s deliberative process” without first meeting the necessary showing required for the “narrow exception” to do so. (See Maragh, 94 NY2d at 573.) These allegations do not constitute a “specific showing of [an] improper influence,” necessary for this court to usher in the juror and her mother to conduct a further inquiry into the matter.
It is also asserted that Juror No. 6 and her mother refused to answer questions from Mr. Hirsch, Ms. Winston, and perhaps other members of the press. (Mr. Hirsch testified that a reporter from one of the New York daily newspapers was also present when he first tried to question the mother [tr at 38, lines 17- *510 24].) As to Juror No. 6, the jury was instructed by the court upon being discharged after the verdict, that while jurors were free to speak about the case, they were equally free to decline to speak to anyone, specifically including the press. As to the mother, no law has been cited that would require her to answer any questions from anyone, and certainly not those propounded by someone who chased her for two avenue blocks after being told to leave her alone, to the point where the questioner, Mr. Hirsch, described her daughter, the juror, as being in fear of him. (Tr at 38, line 1 through 39, line 6.)
There remains, however, the possibility that even if none of these actions individually are sufficient to question the juror and her mother, those actions taken collectively might require further testimony. The court’s examination of the law is to the contrary. While neither the parties nor the court has found any New York case with similar facts, the United States Court of Appeals for the Eleventh Circuit has considered facts remarkably similar in United States v Barshov (733 F2d 842 [11th Cir 1984]). In Barshov, the son of one of the jurors: attended the trial regularly; was seen talking with the jurors (not just his mother), as well as with the prosecutor and defense counsel about the case; gave one of the defendants his “decision” in the case upon commencement of jury deliberations; and after the guilty verdict was returned, told one of the defense counsel “we did as well as we could with what we had” (733 F2d at 851). In affirming the District Court’s ruling declining to order such questioning, the Eleventh Circuit held, in words uniquely applicable to our case:
“Although the pattern of behavior attributed to the juror Phillips’ son may be characterized as unusual and peculiar, that in itself does not suffice to mandate further inquiry. In the absence of a color-able showing that the conduct complained of impugned in any way the integrity of the trial process, the district court was not required to make further inquiries or to conduct a hearing, and its refusal to do so did not constitute an abuse of discretion.” (733 F2d at 852.)
In our case, the behavior of Juror No. 6’s mother may easily be characterized as unusual. But there has been no showing, let alone a colorable showing, that the mother’s conduct impugned the integrity of the trial process. There is no evidence whatsoever that Juror No. 6 violated her oath in any way. The jurors *511 were carefully instructed by the court at each recess not to discuss the case, either among themselves or with anyone else. There is no evidence that Juror No. 6, or any other juror, did not fully comply with the court’s direction. (See e.g. Barshov, 733 F2d at 852 [finding that “(i)t is presumed that the jurors followed the court’s oft-repeated instructions not to discuss the case with anyone”].) As to the mother, after crediting Mr. Hirsch’s testimony, there is no evidence as to what she may have discussed with defendant, and no basis to assume that there was any impropriety.
It is also significant that the jury returned its verdict in less than 10 minutes, following a four-day trial. The court instructed the jury that it would be happy to take a quick verdict, if the jury was able to decide the case expeditiously, and further instructed the jury that it was equally acceptable if it took the jury time to reach a unanimous verdict. It may reasonably be inferred by the fast verdict that from the outset there was no real disagreement among the jurors. This is hardly a case with lengthy deliberations, where it is possible that one juror was ultimately able to convince the rest of the jury to vote contrary to their initial views. Here, the jury rapidly reached its unanimous verdict. Thus, the likelihood of misconduct, if indeed there was any, infecting the jury is extremely remote.
Safeguarding Jurors
New York, for some time, has done away with mandatory sequestration of juries. Even when sequestration was employed, it was only used during deliberation and not during testimony.[6] Thus, the legislature contemplated that jurors would be free to come and go at the end of each trial day, and would therefore be exposed to the possibility of extraneous influences, whether from others or the media. The safeguard envisioned against such influences was the court’s instructions to the jury, not its sequestration. This case is no different.
The jury’s verdict and the jurors’ discharge by the court should ordinarily be the end of their service, and not the *512 midpoint. And, while the parties, counsel and the media are free to speak to the jurors after their discharge, the jurors are equally free to refrain from speaking. The jurors, as the ultimate protectors envisioned by our Federal and State Constitutions of the rights of defendants, are not — and should not be — required to explain their verdict and thought processes to the court or to anyone else. Nor should they be subject to harassment by dissatisfied litigants and their partisans.
This case illustrates why a strong presumption against post-trial jury inquiries exists. It is in the interest of the integrity of our judicial system to protect and insulate jurors from posttrial harassment by any party; an interest recognized by the Supreme Court of the United States nearly a century ago. (See McDonald v Pless, 238 US 264 [1915].) In People v Giuca, the court explicitly recognized the “gaping flaw in New York law regarding the protection of jurors after their trial service has been completed.” (23 Misc 3d 1104[A], 2009 NY Slip Op 50577[U], *7 [2009].) Accordingly, this court fully endorses the legislation proposed by the Giuca court to shield the jurors from intrusive unwarranted posttrial investigation and harassment. Moreover, this court proposes that such legislation should include a geographical restriction, perhaps to the block where the courthouse is located, for anyone seeking to question a juror in person, if any questioning is allowed. In this court’s experience, any juror who agrees to speak regarding the case (and the court recognizes that some do) will do so in the courthouse itself. While the conduct here does not approach that in Giuca, no juror should find herself in the position of our Juror No. 6, being pursued for two avenue blocks after telling the pursuer to desist, to the point where the pursuer himself recognizes that the juror is in fear.
Conclusion
Because there has been no evidence of juror impropriety, the court will not direct that Juror No. 6 or her mother appear for questioning. Additionally, the People have not shown sufficient grounds to continue the stay of sealing previously ordered by the court. However, that stay will be briefly extended until the close of business on August 10, 2012, should the People be advised to seek relief from an appellate court.

. People v Sandoval, 34 NY2d 371, 376 (1974).

. People v Molineux, 168 NY 264 (1901).

. Thus, the prosecution, like the defense, has the right to voir dire potential jurors, and to challenge them for cause and preemptively, subject to constitutional limitations, e.g. Batson v Kentucky (476 US 79 [1986]).

. See e.g. People v Hinton, 31 NY2d 71 (1972).

. A defendant’s right to a public trial is a constitutional guarantee. (See US Const Amends VI, XIV) This right includes the right to have members of the defendant’s family and other spectators be present in the courtroom. (See People v Torres, 97 AD3d 1125 [4th Dept 2012] [conviction overturned due to courtroom being improperly closed to defendant’s wife in violation of the right to a public trial]; People v Martin, 16 NY3d 607 [2011] [conviction overturned due to courtroom being improperly closed to defendant’s father in violation of the right to a public trial].) The court has found no case excluding family members of a juror.

. In 1995, the legislature authorized a trial court presiding over a criminal jury trial, except for a trial involving a class A felony offense or a class B or class C violent felony offense, to declare a temporary recess in deliberations and permit the jury to separate for a reasonable period of time before returning to court to resume deliberations. (See CPL 310.10, as amended by L 1995, ch 83, § 209.)
In 2001, the legislature eliminated mandatory jury sequestration of deliberating juries in all criminal cases. (See CPL 310.10, as amended by L 2001, ch 47, §§ 2, 3.)