OPINION OF THE COURT April A. Newbauer, J. This case illustrates the danger inherent in seating a juror who lives near the crime location. Such a juror may either recall more information about the area during the trial or acquire it inadvertently, and then offer it up to other members of the jury for their consideration during deliberations. On February 27, 2017, the defendant was convicted after a jury trial of criminal sale of a controlled substance in the third degree in violation of Penal Law § 220.39 (1). On April 18, 2017, the defendant moved pursuant to Criminal Procedure Law § 330.30 requesting that this court set aside or modify the verdict of the jury on various grounds, including juror misconduct. The People filed an affirmation in opposition, arguing that jurors are not permitted to impeach their own verdict unless there is a showing of improper influence on one or more jurors that may have prejudiced the defendant. However, the People consented to a limited hearing as to any prejudice resulting from the alleged conviction of one juror and a discussion among jurors of the convictions of another juror’s brother and cousin. In a decision dated June 13, 2017, the court granted defendant’s CPL 330.30 motion to the extent that a hearing was ordered to determine if there was an improper outside influence on any juror that may have resulted in prejudice to the defendant. (See People v De Lucia, 20 NY2d 275 [1967]; see also People v Maragh, 94 NY2d 569 [2000].) In addition to the two issues consented to by the People, the court expanded the hearing to include an inquiry into a third juror’s alleged disclosure of personal insight regarding a barbershop that figured into the prosecution’s theory of the case. Following the hearing in which 11 of 12 sworn jurors testified, the defendant’s motion is granted. Procedural Background During jury selection, after the prospective jurors took an oath but before the formal voir dire, the court posed some preliminary questions to the entire prospective jury panel. Outside the presence of the other prospective jurors, the judge and the parties had the opportunity to probe these issues further. No juror was excused at this stage, before a full voir dire, unless both sides consented and the court agreed there was good cause. Jurors were queried about prior contacts with the criminal justice system, including whether their family members had been convicted of a crime. Another such inquiry concerned knowledge of “the location” where the crime occurred, using the address where the alleged hand-to-hand drug sale took place. During the preliminary screening phase juror Jenkins, later seated, failed to respond to the question about family convictions. The defense motion alleges that Jenkins later disclosed to the jurors that when she was 11 years old, her brother was convicted of attempted murder and sentenced to prison. The defense contended that Jenkins used these facts to argue the defendant was guilty and should have “manned up” to his guilt. In addition, during preliminaries Parker—who was eventually also seated as a juror—disclosed that she lived in the immediate area of 597 East 138th Street, but claimed that she had no particular views about the neighborhood. She was not asked and did not come forward with information regarding any of the surrounding buildings, notably a barbershop. During the trial, the People’s principal witness, an undercover officer, testified that the defendant and a separately apprehended individual (JD Black) acted in concert in selling drugs. A second police witness, Detective Anderson, testified that after the hand-to-hand transaction, the defendant and JD Black parted ways from the undercover officer and from each other. According to the detective, JD Black walked into a barbershop near that location and exited shortly thereafter. Both the defendant and JD Black were arrested separately at different times and places, but prerecorded buy money the undercover used to purchase the drugs was not recovered. To explain why the money was missing, the People in summation asked the jurors to draw the reasonable inference from the facts presented that JD Black, who had just participated in selling drugs, did not want to keep the proceeds on his person and so went into the barbershop. The defense did not object to this argument. On February 27, 2017, the jury convicted the defendant of the top count, criminal sale of a controlled substance in the third degree, in violation of Penal Law § 220.39 (1). The defense counsel requested that the jurors be polled individually. The jurors were asked if the verdict of guilty to the crime of criminal sale of a controlled substance in the third degree was their verdict. Each juror stated that it was. After the verdict was rendered and the record complete, the jurors were informed that they could speak with the attorneys or anyone else about the case if they wished. On April 18, 2017, the defendant filed a CPL 330.30 motion alleging, among other things, various forms of juror misconduct. The People consented to a limited hearing to the extent that a factual dispute was present with respect to two jurors’ convictions, and as to the conviction history of Jenkins’ brother and cousin. In a decision dated June 13, 2017, the court granted defendant’s CPL 330.30 motion to the extent of ordering the hearing. The court framed the issues for the evidentiary phase of the hearing as the effect of the arrest history, if any, of jurors Jenkins and Winston;[1] the use of the conviction history of Jenkins’ brother and cousin; and to what extent, if any, Parker’s familiarity with the barbershop may have had an impact on the verdict. CPL 330.30 Hearing The hearing commenced on July 19, 2017 and concluded on September 29, 2017. The first two witnesses (Epstein and Brax-ton) were called by the defendant. Prior to the hearing, each of these two witnesses provided affidavits which were attached to the defendant’s motion papers as exhibits A and B. After these witnesses testified, the court, upon consultation and consent of the parties, determined that it was necessary to call the remaining deliberating jurors because of allegations raised by the defense witnesses. The defense consented only as to Jenkins and Parker. The remaining jurors were subpoenaed by the court over the defense objection. All the jurors, with the exception of one, appeared and testified. Epstein Epstein was called as a witness by defense counsel; she testified that she met with the defense counsel a few weeks after the verdict and signed her affidavit in support of the defendant’s motion.[2] Epstein indicated that she also wrote a letter about her experience that she contemplated sending to the court, and reviewed that letter before her testimony. While Epstein’s in court testimony overall ranged from annoyingly self-reverential to improbably dramatic and was certainly calculated to achieve a desired result, certain specific facts she recalled cannot simply be dismissed: 1. Discussion of Prior Convictions Epstein testified that when the jury first sat down to deliberate, some jurors discussed their own convictions. (Tr at 5.) Asked which jurors did this, Epstein said, “Everybody was oh, I remember when I was arrested.” (Tr at 6.) When pressed for more than a sweeping pronouncement, Epstein stated that Jenkins said her brother had been convicted of attempted murder and was serving nine years. Epstein also cited Winston’s disclosure that she was arrested for walking through subway doors and her husband for selling marijuana; Jenkins’ arrest for assault; and Parker for filming a fight. Other jurors’ arrests she merely thought she had heard something about but could not call up. 2. Discussion of the Barbershop Epstein knew that Parker lived in the neighborhood where the incident took place. Epstein testified that this came up because Parker said she knew for a fact that the barbershop in question had something to do with the incident—Parker believed that the absent codefendant had “ ‘switched out’ the buy money in the barbershop because that barbershop was a well-known shop for, I guess drug activity.” (Tr at 9.) She and some of the jurors then objected, reminding the jurors that they were not supposed to make up the story or fill in the details, but Epstein said that Parker told the jury, “I know for a fact that that barbershop is a front for drug activity . . . She knew that because she lived in the neighborhood and everybody knew that it was a well-known fact.” (Tr at 25.) Later in her testimony, Epstein backtracked on this exact language but not on the fact that Parker had expressed expertise on this issue because she lived in the neighborhood. Braxton Braxton was also called as a witness by defense counsel. She spoke with the defense attorneys after the verdict was rendered and later provided an affidavit.[3] Unlike Epstein, Braxton’s testimony was not delivered in an exaggerated fashion to achieve a specific result. Braxton confirmed that during deliberations, several jurors talked about their arrest history and/or their families’ conflict with the law, including Parker and Jenkins. She did not remember the particulars of what these jurors were arrested for or how long anyone was in jail. Braxton testified that she believed that the discussion by Jenkins about her cousin’s and brother’s arrests as well as a neighbor’s arrest for dealing drugs factored into the deliberations. Braxton recalled that Jenkins informed the jury that the police had knocked on her neighbor’s door and arrested him for something drug-related and her brother served time for a violent crime of some sort. Jurors heard this as they debated the significance of the police presence near the defendant’s apartment. Braxton believed Jenkins was trying to use her experience of “how drug cases work” to explain how the police ended up in or outside the defendant’s apartment. (Tr at 40-41.) Brax-ton recalled Jenkins saying the defendant should just admit his guilt because that is what her family had done. Braxton said she reminded Jenkins and the other jurors that family issues had nothing to do with the case and that things were getting too personal. Braxton also testified that on the second day of deliberations, Parker and Jenkins mentioned that they were familiar with the area and that it was a high drug area so that there was a high probability that there were drugs being sold there. She said some jurors made comments in opposition, to the effect that just because things happen in the area, does not mean that the defendant engaged in drug selling. In addition, Brax-ton testified that Parker insinuated that the barbershop could have been the hot spot of the drug trade in terms of how someone had walked into the barbershop and why the money was not recovered. But Braxton did not remember Parker saying she had knowledge that the particular barbershop was a drug hot spot. Instead, she remembered Parker “explaining” how drug transactions work—there would be someone inside the barbershop who is the main person and then the runner would go in and exchange the money. (Tr at 44.) Court Subpoenaed Jurors Juror Peart testified that during jury deliberations Jenkins said her brother was convicted of a felony drug charge but he did not recall the sentence. Peart thought Jenkins mentioned this more than once. He stated that all the jurors were present but none of the jurors commented on Jenkins’ statement. It did not affect him much. Peart did not recall anyone else talking about convictions of family members or a family member who was convicted of attempted murder. Peart remembered that evidence was presented during the trial regarding a barbershop and the jurors discussed the barbershop, but not whether Parker said anything about it. Smith testified that she remembered Jenkins but she did not hear Jenkins say that her brother had a criminal conviction for attempted murder. Smith stated that someone on the jury said that she had a family member who spent time in prison. Smith believed that most of the jurors were present when this statement was made, that it was made more than once, and that it was during deliberations. However, Smith stated that there was no general discussion about a conviction. Smith had the impression that Jenkins wanted the jury to come to a decision because she did not have time to remain deliberating. Smith also said she recalled Parker but did not hear her or any juror say they had prior familiarity with a barbershop. Smith recalled evidence presented regarding a barbershop at the trial, but she did not recall a discussion about the barbershop. Wright testified that he did not recall the names Jenkins or Parker but might remember their faces if he saw them again. Wright did not recall Jenkins or any other juror discussing convictions of family members. He did, however, recall that a female juror said she knew the area and “they do illegal things in that barbershop.” He assumed what she meant was to sell drugs. Wright remembered the comment as having been made one day when the court broke for lunch after a photograph of the barbershop was introduced into evidence. He thought all the jurors were present. He did not remember anyone bringing up this information during deliberations. Griffin, the foreperson, testified that the names Jenkins and Parker sounded familiar but she did not recall any juror in particular. She did not hear that anyone had a family member who was convicted of attempted murder or any juror say they were familiar with the barbershop. Griffin remembered that on the first day of trial one of the female jurors indicated that she did not live too far from the area and knew the neighborhood where the incident took place. Griffin could not recall where this statement was made or the context in which it was made. Griffin testified that she was not part of any discussion about illegal or drug activity during deliberations, and volunteered that she did not go to lunch with any of her fellow jurors. Rodriguez recalled Parker but did not remember if Parker mentioned familiarity with the barbershop; only that she lived around that area, knew people around the area and had familiarity with the surrounding area. He said that Parker mentioned this prior to deliberations when all of the jurors were present. Rodriguez did not recall Parker saying anything about drug activity in that area. Jurors Williams and Winston did not recall any discussions of prior convictions or Parker’s familiarity with the barbershop. Juror Mercer Bonner was subpoenaed by the court twice and did not appear on either date. Neither party wished to pursue further inquiry with this juror or seek sanctions against this juror for her failure to appear. Jenkins and Parker Jenkins testified that her brother had been convicted in Florida of the crime of attempted murder more than 15 years before the trial when she was 11 years old.[4] She believed that her brother served 7V2 to 9 years. She denied having a cousin that was convicted of a crime. Jenkins testified that she did not discuss anything involving her brother or his conviction during jury deliberations and his case did not affect her verdict. Jenkins denied telling any of the jurors that her brother was innocent and yet “took his lumps” and so should the defendant. She said she believed her fellow jurors were mistaken about all of this because she had never been arrested—it was Parker who mentioned while having lunch one day that she was arrested for a fight but when she went to the precinct she was not charged. When asked by the People about how two of the jurors knew that her brother was convicted of attempted murder and serving a nine year prison sentence, Jenkins testified that while she did not recall talking about the situation at all, maybe she did tell one or two jurors with whom she was really close—Griffin (who denied knowing) and a female alternate juror. Jenkins stated she thought she was brought back to court for the posttrial hearing because one juror and she did not get along. Jenkins claimed this juror (Epstein) singled her out all the time. Whatever the cause of the tension between these two jurors might have been, Jenkins’ denials of her disclosures about her brother and neighbor rang false. Jenkins fervently denied that she attempted to sway the jury with reference to her brother and neighbor’s involvement in the criminal justice system but at the same time admitted she had a stake in the outcome of the hearing. Jenkins’ brother’s conviction, at a minimum, was reported by too many jurors to have been fabricated. Jenkins’ testimony on this subject was not credible. As to the barbershop, Jenkins testified that “some juror” said they lived around the area but did not recall anything specifically discussed about the location or the barbershop. Jenkins also claimed that none of the other jurors brought up the barbershop during deliberations. Parker appeared as a witness on consent of the parties pursuant to a court-ordered subpoena. Parker said she did not hear any member of the jury discussing a family member who had been arrested or convicted of a crime, including Jenkins. Parker reminded the parties and the court that she disclosed having lived in the same neighborhood as the incident for the past 20 years. Yet Parker denied telling any of the jurors during the deliberations that she lived in the neighborhood. She did admit telling Jenkins at some time during the case while seated in the waiting area. Parker said that on the third day of jury duty, she and Jenkins were talking about how they looked familiar and they discovered that Parker’s cousin and Jenkins’ sister were dating. During this conversation, other jurors were present in the room but everyone was having their own conversation so she did not know if other jurors overheard her conversation with Jenkins. Parker also admitted she argued during deliberations that the prerecorded money could have been dropped in the barbershop as the evidence showed and the People discussed in their summation. She denied saying that the area was a drug prone location or high drug area or that the barbershop was a well-known shop for drug activity. Parker’s purported explanation for how and when she learned about the barbershop is so convoluted that it cannot be accurately described, let alone credited. When compared and weighed against the credible accounts of the other jurors, her testimony makes no sense. Parker’s testimony is rejected as entirely incredible. Conclusions of Law As a general rule, a jury verdict may not be impeached by probes into the jury’s deliberative process. (See People v Brown, 48 NY2d 388 [1979]; People v Sprague, 217 NY 373 [1916]; Richardson on Evidence § 6-112.) A showing of improper influence provides a necessary and narrow exception to this general proposition. (Brown at 393.) Improper influence includes even “well-intentioned jury conduct which tends to put the jury in possession of evidence not introduced at trial.” (Id.) Criminal Procedure Law § 330.30 provides that a court may set aside a verdict, prior to sentencing, if there occurred improper conduct by a juror or by another person in relation to a juror which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict. The facts must be examined to determine the nature of the material placed before the jury and the likelihood prejudice would be engendered. (People v Brown, 48 NY2d 388 [1979].) Policy considerations underlying the general rule against impeachment of a jury’s verdict must be balanced against defendant’s fundamental right to trial by a fair and impartial jury. In that context, evidence of an outside influence on the jury is held to constitute an exception to the general rule. (See Mattox v United States, 146 US 140 [1892] [during deliberations, jurors read a newspaper article containing opinions about the quality of the evidence and the defendant’s guilt and the defendant demonstrated that those overt extraneous influences were shown to have affected the objective evidence before the jury].) In assessing whether a particular action rises to the level of misconduct, the conduct complained of must be something more than an application of everyday experience, which is what the jurors are instructed to and expected to use in their assessment of the evidence. The information regarding the barbershop was presented by a juror who claimed to live in the area. Her observations were communicated to members of the jury and discussed either before or in the course of deliberations. While there is no admission that the juror’s statements about the barbershop actually tainted any one juror’s verdict, the inference is present. Epstein said the absence of prerecorded buy money was an issue for some jurors. Braxton testified that several jurors changed positions after the barbershop discussion. (Cf. People v Plowden, 150 AD3d 896, 897 [2d Dept 2017].) Although Parker’s “knowledge” appeared to consist mainly of hearsay from her sister and had no discernible substantive basis, at least several jurors seem to have relied on it to close a key loophole in the prosecution’s case. Wright recalled that Parker raised these facts before deliberations even began, during a recess shortly after the jurors saw photographs of the street. He stated that Parker’s comments were made when all jurors were present although he did not know who overheard them. Several of the testifying jurors had scant little recollection of what was discussed during deliberations many months later. One chose to ignore the court’s subpoena entirely and her thinking is unknown. Given these circumstances, the fact that the deliberating jury likely had before it Parker’s opinion of the neighborhood and characterization of the barbershop, nothing more is necessary. The inherent prejudice to the defendant warrants a new trial although no juror said it was determinative of the vote he or she cast. (See People v De Lucia, 20 NY2d at 280; People v Redd, 164 AD2d 34, 37 [1st Dept 1990] [juror’s unauthorized report on crime scene tainted deliberations].) When determining a motion to set aside a verdict based on jury misconduct, the question is the nature of the outside material before the jury and the likelihood that prejudice would result. (See People v Plowden, 150 AD3d 896, 897 [2017], citing People v Brown, 48 NY2d 388 [1979].) In Brown, the Court of Appeals articulated a test to be used in deciding whether there was an improper influence on the jurors which compromised the verdict: whether the outside information was directly material to a point at issue in the trial; created a substantial risk of prejudice to the rights of the defendant by coloring the views of the jurors; put before the jury evidence that could never have been admissible at trial because it was not comparable; and the error could not be excused because the degree to which the jury process was compromised could neither be tolerated nor deemed harmless. (48 NY2d at 393-395.) The information and alleged expertise offered by a juror who had lengthy ties to the area where the incident took place meets these criteria. The allegations against juror Jenkins fall into a different category. While many jurors might have knowledge of the criminal justice system through their own experiences or those of relatives and friends, if they fail to come forward with them when specifically asked to, the parties are unable to explore potential biases and necessarily forgo the opportunity to strike them as jurors. (See People v Rivera, 304 AD2d 841 [2d Dept 2003].) Courts routinely dismiss jurors who fail to come forward with views of law enforcement and the criminal justice system if it is discovered before the deliberations begin. (See e.g. People v Paige, 134 AD3d 1048 [2d Dept 2015]; People v Tamayo, 256 AD2d 98 [1st Dept 1998], lv denied 93 NY2d 979 [1999].) While concealment of information during voir dire is not an automatic reason to set aside a verdict (see People v Rodriguez, 100 NY2d 30 [2003]), Jenkins’ nondisclosure added to the already problematic information put before the jurors. Further, Jenkins did not just omit a portion of her background (see People v West, 4 AD3d 791 [4th Dept 2004]); she withheld a response to a basic preliminary question from the court which was specifically designed to allow an exploration of potential bias with individual jurors. Far too much potential for prejudice to the defendant exists to allow the verdict to stand. The defendant’s motion is granted, and the verdict is set aside. . That issue was resolved at the hearing. . As the People observe, both Epstein’s affidavit and her testimony contain multiple complaints about the deliberations process itself, some more serious than others, but none a proper subject for a hearing. “Where, as in the case of statements regarding juryroom deliberations, every verdict might be rendered suspect, and jurors might become subjected to continuous posttrial harassment, the public policy reasons for holding such statements inadmissable must ordinarily override possible injustice to a defendant, for here our jury system itself is at stake.” (People v De Lucia, 20 NY2d 275, 279 [1967]; Jerome Prince, Richardson on Evidence § 6-112 [Farrell 11th ed 1995].) Epstein claimed most of the jurors tried to review the evidence and discuss it in a reasonable manner but at times deliberations became very hostile: when she brought up an issue at several points, two jurors (Jenkins and Parker) shouted her down. Epstein alleged that the same two jurors and another (Griffin) wore everyone down screaming at them until they voted guilty. Epstein testified that she did not believe the jury followed the judge’s instructions on the presumption of innocence. She also indicated Jenkins discussed with other jurors having a hardship continuing deliberations, telling some that she needed to go back to work. Epstein also claimed that the foreperson (Griffin) was very upset because she felt personally responsible for bringing deliberations to an end with a verdict, and it was her duty to make sure that it was guilty. Epstein said Griffin refused to write another deadlock jury note, and so on. After the court’s version of an Allen charge at the end of the day on Friday, Epstein said it appeared that the majority of the jurors “flipped” and all (including her) on Monday agreed to take a vote and abide by the majority, whichever way it turned out. The jurors were polled at the conclusion of the case in open court and each juror affirmed his or her decision, in open court, without reservation. No juror gave an indication that the verdict was not freely his or her own. Therefore, a juror’s claim that the defendant was denied the right to a jury of 12 because the complaining juror merely acquiesced in the verdict is unsupported by a record in which each juror confirmed the verdict during a subsequent jury poll. (See People v Sampson, 201 AD2d 314 [1st Dept 1994].) Since no reservations were expressed by the disaffected jurors before the verdict was rendered, they cannot now be permitted to impugn the finality and integrity of that verdict by belated claims of alleged coercion by other members of the jury (Id.; see also People v Redd, 164 AD2d 34, 37 [1st Dept 1990].) Post-verdict complaints regarding the tenor and dynamics of the deliberative process essentially amount to belated misgivings or second thoughts. These complaints are insufficient to overturn a verdict. (Redd at 38.) . Braxton’s testimony corroborated Epstein’s as to many aspects of what occurred during jury deliberations. Braxton stated that toward the end of deliberations the foreperson refused to write a second note stating that the jury was unable to come to a unanimous decision. After some debate with the deliberations getting heated at several points, Braxton said the majority of the jurors believed that they had to come to a decision and that the judge would not accept the jury not being able to come to a unanimous decision. At one point the vote was tied, and two people decided to change what they were saying at that time just to get a majority verdict of guilty. The others ultimately agreed, even though some people expressed concern. (Tr at 37.) . Jenkins initially stated she was not old enough to understand the proceedings when they occurred and that is why she did not bring it to the parties’ attention during jury selection. When questioned by the defense, Jenkins switched gears and said she did not mention it during jury selection because she did not think it was relevant. Since her brother’s conviction was for attempted murder and the defendant was charged with criminal sale of a controlled substance, Jenkins reasoned, one charge had nothing to do with the other.