People v Santana (2021 NY Slip Op 06329)





People v Santana


2021 NY Slip Op 06329


Decided on November 16, 2021


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 16, 2021

Before: Gische, J.P., Webber, Mazzarelli, Shulman, Pitt, JJ. 


Ind No. 3562/15 Appeal No. 14484 Case No. 2018-2589 

[*1]The People of the State of New York, Respondent,
v
Estaban Santana, Defendant-Appellant.


Janet E. Sabel, The Legal Aid Society, New York (David Crow of counsel), and Davis Polk & Wardwell LLP, New York (Matthew S. Vasilakos of counsel), for appellant.
Darcel D. Clark, District Attorney, Bronx (John T. Komondorea of counsel), for respondent



Judgment, Supreme Court, Bronx County (April A. Newbauer, J.), rendered December 4, 2017, convicting defendant, after a jury trial, of attempted robbery in the first degree, and sentencing him to a term of 3½ years, unanimously reversed, on the law, and the matter remanded for a new trial.
Defendant was charged with attempted robbery in the first degree and other offenses based on allegations that he, acting in concert with codefendant Brownie Lopez, attempted to rob Jose Candia-Perez (Perez). Lopez pleaded guilty to a misdemeanor and was sentenced prior to trial.
The People's evidence at trial indicated that at approximately 1:40 a.m. on November 25, 2015, Perez was walking home when two men approached him on the street. According to Perez, one of the men was wearing a red sweatshirt, had noticeably darker skin than the other and had pimples on his face. The other man was wearing a gray sweatshirt with a hood hanging in the back. According to Perez, at some point the man in red brought out an object and attempted to stab him.
Perez called 911 and told the operator that two "Dominicans" had tried to rob him. Three to four minutes later the police arrived, and with Perez they canvassed the area in the patrol car. A block from the scene, four officers had detained defendant and codefendant Lopez. When Perez and the officers reached them, one of the officers in the car asked Perez whether he recognized either of the men the police detained. Perez stated that he "wasn't sure."
Defendant pursued a misidentification defense. As part of this argument, the defense put into evidence the arrest photos for defendant and Lopez and argued in summation that the appearances of defendant and Lopez differed in important respects from the description Perez gave of the assailants on the 911 call. Counsel also noted that Perez described one of the assailants as being taller than the other, but that, as verified from the arrest photos, defendant and Lopez were the same height. In addition, counsel argued that defendant had several distinctive features, such as an earring, braids and a mustache, but Perez did not mention any of these features when he described the assailant wearing red. Counsel also noted that Perez was unable to identify defendant in court, stating that he was "not sure" whether the "person in red" was in the courtroom, and initially failed to identify him twice at the showup.
Following four days of deliberation and an Allen charge by the court, the jury found defendant guilty of attempted robbery in the first degree.
The defense filed a motion to set aside the verdict pursuant to CPL 330.30(2) on the ground of juror misconduct. In a supporting affirmation, defense counsel stated that after the verdict, he had spoken to several members of the jury. When counsel asked Juror No. 12 what led him to vote in favor of guilt, he stated that he was curious about defendant, who did not testify at trial, and that he and other jurors had [*2]learned that codefendant Lopez had a "violent" past. Juror No. 12 further explained that he and the other jurors had discovered, and discussed during trial, a video posted on YouTube showing Lopez punching a man, ultimately leading to that man's death. Counsel asked Juror No. 12 whether the video led him to vote in favor of guilt, to which he responded, "[i]t certainly didn't help." The defense argued that Juror No. 12's revelations demonstrated juror misconduct sufficient to set aside the verdict, or, in the alternative, a hearing should be ordered.
The defense also submitted a copy of the Lopez video which shows Lopez lunging forward and striking another man with full force across the face. The victim immediately falls back from the force of Lopez's punch, ultimately leading to his death.
At the CPL 330.30 hearing, which the court conducted over five days, all of the jurors and alternates testified. A number of jurors testified that some jurors had viewed and discussed the video depicting Lopez and identified him as the individual acting in concert with defendant. Nine jurors claimed not to remember anything about the Lopez video.
Juror No. 11 testified that, during a break in the testimony of one of the police officers, the jurors discussed Lopez while in the waiting room. Juror No. 11 apparently had seen the video for the first time years earlier. He testified that "a few of [the jurors]," and maybe he himself, searched the Internet, found the video on their phones, and watched it together. He testified that four or five other jurors discussed the video.
Juror No. 11 further testified that the first time he made the connection that Brownie Lopez was the same person in the Lopez video was when he and four or five of the other jurors watched the video in the waiting room. When the court asked if he remembered hearing the name Brownie Lopez from the list of names the court read during voir dire, Juror No. 11 testified that he did remember hearing it but failed to make the connection to the video at that time. Juror No. 11 also testified that he, and the other jurors, looked at Lopez's arrest photograph and discussed how the same Mr. Lopez in the arrest photo was depicted in the video.
Juror No. 11 also described how, during deliberations, the jurors turned Lopez's arrest photo face down on the table and disregarded it because the jury had "hit like . . . a standing point." Juror No. 11 explained that "we were just arguing with each other [and] weren't making any progress, so we recognized that . . . we were jurors for the trial for Mr. Santana, not for Brownie Lopez . . . so we just ruled away [Lopez's] presence . . . from making our decision."
On cross-examination, Juror No. 11 stated that the video "did not impact my decision in any way" and that he made his decision based on "nothing outside of the evidence and the testimony." He testified that the video was not discussed during deliberations, and that, at the time of the hearing, he [*3]still did not know whether the person depicted in the video was codefendant Brownie Lopez.
Juror No. 12 also testified that the jurors discussed Lopez while in the waiting room. He stated that he did not watch the video during trial but had seen it sometime before serving as a juror. Juror No. 12 disclosed that the jurors thought Lopez "looked familiar," but none of them were certain that it was the same individual until Alternate Juror No. 1 watched the video and "verbally" confirmed that it was the same Lopez depicted in the arrest photo. Juror No. 12 further revealed that Alternate Juror No. 1 confirmed this right after the jurors saw Lopez's arrest photo because she "looked it up."
Alternate Juror No. 1 denied having ever seen the video or having talked to Juror No. 12 about it and testified that it was not discussed during deliberations. Similar to Juror No. 11, Juror No. 12 also testified that he and the other jurors looked at Lopez's arrest phot0 and had a "group discussion" about him being the same Lopez in the video. When asked if the video affected his verdict in the case, Juror No. 12 responded, "not at all." He further stated that the video was not discussed during deliberations and that he followed the court's instructions in the case. He also testified that the discussion in the waiting room was cut short when another juror reminded the group that they were not supposed to be discussing anything about the case.
Juror No. 7 testified that she did not see the video until after the trial when she googled the name Brownie Lopez. She testified that when Lopez's photo "was being looked at," one juror, whom she could not identify, commented that Lopez "had prior charges." Similar to Juror No. 12, she testified that the discussion was "shut down by another juror and we never spoke about it." At that point the "picture was put to the side for [ ] the rest of deliberations." Juror No. 7 further testified "it was just like, can we focus on Estaban, the case is about Estaban."
In his post-hearing submission, defense counsel argued that the hearing testimony established beyond any doubt that the jurors had improperly accessed the Lopez video and widely discussed it both during the evidentiary phase of the trial and during deliberations, thus prejudicing defendant notwithstanding juror testimony that it had not influenced their ultimate decision. Defense counsel concluded there was a substantial risk that the jurors were led to decide, based on facts not in evidence, that defendant was guilty "because he was associated with a very violent person."
The defense also argued that the Lopez video was particularly prejudicial because it undermined a central part of the defense at trial that there were "huge discrepancies between the description Perez gave of the person he later identified as being Lopez and the way Lopez looked in his arrest photo." The jurors had acknowledged that, in a misguided effort to deal with the prejudicial video on their [*4]own, they had decided to ignore Lopez's arrest photo during deliberations, rendering themselves unable to consider a crucial part of the defense's case — that Lopez's arrest photo showed Perez was mistaken in his identification.
The People argued that the jurors had limited exposure to the video and it was not "directly material to a point at issue in the trial" because it concerned Lopez, not defendant, and they were not tried together. Finally, the People argued that those jurors exposed to the Lopez video were not prejudiced by it because the jurors "testified unanimously" that they only considered evidence presented at trial in reaching their verdict.
In denying defendant's motion to set aside the jury's verdict, the court found that defendant failed "to demonstrate any impact of the video on the verdict." In evaluating the testimony before it, the trial court's decision focused on the testimony of Juror No. 11 and Juror No. 12, and on "questions about whether jurors can be insulated from trial publicity in the digital age[.]" Although the court acknowledged that videos could have subtle and even unconscious impact on viewers, it nonetheless noted that because jurors might frequently be exposed to irrelevant information through the course of ordinary Internet activity, a proper test is also needed to evaluate "whether the information likely influenced any juror's verdict."
The court further stated that it doubted the credibility of some of the jurors' testimony. In particular, it found Juror No. 11's testimony that he still did not know whether the man in the video was Lopez to be disingenuous. The court also credited defense counsel's version of his posttrial conversation with Juror No. 12 over Juror No. 12's "grudging recollection of that encounter." The court also "rejected as incredible" Alternate Juror No. 1's denial that she discussed the video. Describing the witnesses' demeanor on the witness stand, the court stated that Juror No. 12 was "hostile and withholding" while Juror No. 11 was "sarcastic and bored." However, the trial court ultimately concluded that the jurors had considered only the evidence presented at trial.
The court stated that "[t]he real issue here is whether the jurors who saw the video and others who may have heard about it adequately discounted it during their deliberations." Based on the facts before it, the court found that the Lopez video did not taint jury deliberations because the jurors were able to successfully put aside any prejudice created through the introduction of information about Lopez's criminal past.
On appeal, defendant argues that the court erred in denying his motion to set aside the verdict based on juror misconduct. He contends that juror access to the Lopez video prejudiced him. Defendant argues that the "inflammatory" video exposed some jurors to facts not in evidence which tended to show that Lopez had a propensity for criminality and violence. Defendant asserts that this "compromised [*5]the jury process because it caused jurors to impute a violent character onto [defendant] by guilt by association." We agree.
"CPL 330.30 (2) authorizes a court to set aside a verdict on the ground of juror misconduct that 'may have affected a substantial right of the defendant' and 'was not known to the defendant prior to the rendition of the verdict.' If juror misconduct of the kind outlined in CPL 330.30 (2) is found, the court is not to engage in a separate harmless error analysis. However, '[a]bsent a showing of prejudice to a substantial right,' CPL 330.30 (2) is not implicated in the first place. As such, '[e]ach case must be examined on its unique facts to determine the nature of the misconduct and the likelihood that prejudice was engendered'" (People v McGregor, 179 AD3d 26, 29 [1st Dept 2019], lv denied 34 NY3d 1161 [2020]).
Here, the jurors observed an Internet video of defendant's codefendant, Lopez, violently causing a man's death. The video did not appear in evidence and there was no testimony or mention of the video at trial. The video created a substantial risk of prejudicing the verdict as it permitted jurors to perceive the codefendant as having a propensity for violence, and then to perceive that same propensity to apply to defendant through a guilt-by-association chain of reasoning. The jury's action in turning Lopez's photograph over would appear to indicate a conscious recognition of Lopez's impact upon its determination of the charges against the defendant. Indeed, in its decision, the trial court acknowledged that videos could have a subtle and even unconscious impact on viewers. It also acknowledged that it doubted the credibility of some of the jurors' testimony.
We find that the totality of the circumstances in this case supports the likelihood that prejudice was engendered by the jurors' viewing of the video (see McGregor, 179 AD3d at 29). We disagree that under these facts it can be concluded that jury deliberations were not tainted by the Lopez video and/or that the jurors were able to successfully put aside any prejudice created through their unauthorized possession of information about codefendant Lopez's criminal past.
The right to a fair trial requires a jury to consider only the facts in evidence and not any "outside influence" (Parker v Gladden, 385 US 363, 364-365 [1966]). A "jury verdict may not be impeached by proof of the tenor of [the jury's] deliberations, but it may be upon a showing of improper influence" (People v Brown, 48 NY2d 388, 393 [1979]). Improper influence includes "even well-intentioned jury conduct which tends to put the jury in possession of evidence not introduced at trial" (id.). One form of improper influence is outside information from the Internet, such as the Lopez video, which was present here (see People v Neulander, 34 NY3d 110, 112-113 [2019]).
Accordingly, we find that the trial court should have granted defendant's CPL 330.30(2) motion to set aside the verdict based on [*6]juror misconduct and granted a new trial.
THIS CONSTITUTES THE DECISION AND ORDER OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: November 16, 2021